## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No.: 21-cv-1538

**AARON HERNANDEZ**, an individual,

      Plaintiff

v.

**THE CITY AND COUNTY OF DENVER**, a municipality,
**OFFICER JAYME R. LARSON**, in their individual capacity,
**OFFICER VANCE JOHNSON**, in their individual capacity,
**SERGEANT MICHAEL O'NEILL**, in their individual capacity,
**DETECTIVE ASHLEY BOTELLO**, in their individual capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Aaron Hernandez, by and through counsel, Baumgartner Law, LLC, respectfully submits this Complaint against the Defendants and alleges the following:

### JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. 1983, 1988, the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. 1331, 1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. 1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

**PARTIES**

3.      Plaintiff Aaron Hernandez is and was at all relevant times a citizen of the State of Colorado, residing in Denver County, Colorado.

4.      Defendant City and County of Denver is a government entity in the state of Colorado, County of Denver.

5.      Defendant Officer Jayme R. Larson is or was at all times relevant a citizen of the State of Colorado, employed by the Denver Police Department.

6.      Defendant Officer Vance Johnson is or was at all times relevant a citizen of the State of Colorado employed by the Denver Police Department.

7.      Defendant Sergeant Michael O'Neill is or was at all times relevant a citizen of the State of Colorado employed by the Denver Police Department.

**GENERAL ALLEGATIONS**

8.      Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

**Background Facts**

9.      Officer Jayme R. Larson was disciplined in an administrative action by the Denver Police Department as a result of this incident for Conduct Prohibited by Law – IAB P20019-0007.

**Facts Specific to June 30, 2019**

10.     Aaron Hernandez ("Mr. Hernandez") was sitting in the passenger seat of a parked vehicle in a church parking lot when officers approached the vehicle.

11.     Mr. Hernandez's son, Aaron Hernandez, Jr., ("Mr. Hernandez, Jr.") was sitting in the front driver seat of the vehicle.

12.     Sergeant Michael O'Neill ("Sergeant O'Neill") approached the vehicle on the driver side and made contact with Mr. Hernandez, Jr.

13.     Mr. Hernandez, Jr., had a non-violent warrant out for his arrest. Sergeant O'Neill had Mr. Hernandez, Jr., step out of the vehicle.

14.     Mr. Hernandez, Jr., was then taken into custody from the driver's side of the vehicle without incident on a warrant for a non-violent offense.

15.     As Mr. Hernandez, Jr., was taken to the squad car, Mr. Hernandez, opened the passenger side door to get out and see what was going on. When he opened the passenger side door there were no officers near the passenger side of the car.

16.     Mr. Hernandez was not suspected of any crime at the time he tried to exit the vehicle and stand.

17.     Mr. Hernandez was simply trying to exit a parked vehicle after his son had just been arrested. Mr. Hernandez had not ever been ordered to remain in the vehicle.

18.     Officer Jayme R. Larson ("Officer Larson") made contact with Mr. Hernandez while he was exiting the vehicle.

19.     Officer Larson ran up on Mr. Hernandez as he was standing up from the passenger seat of the vehicle.

20.     Officer Larson did not make any statements or issue any commands to Mr. Hernandez.

21.     As soon as Officer Larson was close enough, she grabbed Mr. Hernandez by both writs with an unnecessary and unreasonable amount of force and prevented any further movement of Mr. Hernandez.

22.     Officer Larson then began to place Mr. Hernandez under arrest even though no crime had been committed and there was no reason for anyone to believe Mr. Hernandez had committed any

crimes.

23.     Mr. Hernandez immediately told Officer Larson he had medical issues and had previously

had intestinal surgery and suffered from severe sciatic pain.

24.     Officer Vance Johnson ("Officer Johnson"), without request by Officer Larson or for any

law enforcement purpose, grabbed a hold of Mr. Hernandez.

25.     Officers Larson and Johnson were using enough force on Mr. Hernandez so as to indicate

to him, or any reasonable person subjected to the same level of force, that he was not free to leave.

26.     Mr. Hernandez who was sixty years old at the time could barely stand due to ongoing

medical issues involving his sciatic pain and just having had intestinal surgery.

27.     At no point while Officers Larson and Johnson had Mr. Hernandez in their full control did

he attempt to flee, resist, or make any movements indicating he would try to fight or harm the

officers.

28.     Officers Larson and Johnson never gave any commands to Mr. Hernandez while he was in

their control. The two officers just shoved Mr. Hernandez against the side of his son's vehicle.

29.     While forced up against his son's vehicle Mr. Hernandez was struck in the side of his torso

with a closed fist by Officer Larson.

30.     Simultaneously, while forced up against his son's vehicle Mr. Hernandez was hit with an

elbow strike by Officer Johnson.

31.     Mr. Hernandez immediately dropped to the ground in severe pain.

32.     While this was happening, Sergeant O'Neill stood and watched his officers assault a frail

and defenseless elderly man. Sergeant O'Neill did nothing to intervene and stop his officers from

engaging in a clearly unconstitutional and illegal assault on Mr. Hernandez.

33.     After the assault, Mr. Hernandez explains that he is in significant pain due to his recent surgery and sciatic nerve pain, and Officer Johnson responds, "Well now your face can hurt too!" Officer Johnson then realizes his body camera is recording and states, "Camera Off." And turns the recording off.

34.     Shortly after this statement, the officers can be seen howling with laughter as Mr. Hernandez groans in pain in the back of the police car. It is clear that they all derived significant pleasure from beating and visibly injuring this disabled old man.

35.     As a result of Officer Johnson's elbow strike, Mr. Hernandez had to receive medical treatment at the hospital for serious injuries to his face.

36.     To cover up their unlawful assault, the three defendant officers charged Mr. Hernandez with two counts of felony assault on a peace officer.

37.     When Mr. Hernandez asked the officers what he was under arrest for, he was told "We haven't figured that out yet."

38.     Officers Larson and Johnson made demonstrably false comments at the scene and in their police reports about Mr. Hernandez striking and kicking them during the incident.

39.     All charges against Mr. Hernandez were dropped by the Denver District Attorney's Office because the evidence clearly showed the officers illegally assaulted Mr. Hernandez and at no point did Mr. Hernandez do anything that could be considered an 'assault on a police officer.'

40.     Officer Larson was eventually disciplined in an administrative action by the Denver Police Department as a result of this incident for Conduct Prohibited by Law as result of her interaction with Mr. Hernandez. The Denver police department has not disciplined Sergeant O'Neill nor Officer Johnson for a failure to intervene or the use of unreasonable force.

41.     Sergeant O'Neill conducted a use of force investigation into Officer Larson's and Officer Johnson's actions and found "[n]o areas of operational improvements." The report further states both officers "were recognized for displaying professionalism and restraint" and "Officer Larson was further recognized for her calm, non-confrontational demeanor and attempt to de-escalate her initial interaction with Hernandez, Sr."

42.     Further, not only was Officer Larson's and Officer Johnson's excessive force approved by their Supervising Sergeant, who was on scene and witnessed the incident, Denver Police Department Detective Ashley Botello noted in her report that she reviewed the use of force reports and the body worn camera footage and "noted that everything in the report was accurate."

## CLAIMS FOR RELIEF

## CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983

43.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

44.     The Fourth Amendment of the U.S. Constitution prohibits unreasonable or excessive use of force in connection with searches and seizures. While detaining, restraining and/or arresting a person the Fourth Amendment protections only allow police officers and deputies to use the amount of force that is reasonably necessary under the circumstances.

45.     The Fourteenth Amendment guarantees a person cannot be deprived of their life, liberty, or property without due process of law.

46.     It is clearly established in Colorado and the 10th Circuit that it is unreasonable to arrest a person without probable cause. *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir.2007); *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir.2008).

47.     It is clearly established in Colorado and the 10th Circuit that it is unreasonable for officers to use gratuitous force on a compliant arrestee. *McCowan v. Morales*, 945 F.3d 1276 (10th Cir.2019).

## FIRST CLAIM FOR RELIEF
### Violation of the Fourth Amendment of the United States Constitution
### Unconstitutional Seizure:
### Lack of Reasonable Suspicion and/or Probable Cause
### (Against Officer Jayme R. Larson, Officer Vance Johnson, and Sergeant Michael O'Neill)

48.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

49.     Mr. Hernandez was not suspected of any crime at the time Officer Larson made contact with him.

50.     Mr. Hernandez was simply trying to exit a parked vehicle after his son had just been arrested.

51.     Officer Larson made no statements or commands to Mr. Hernandez before she ran up on him and grabbed both of his writs in an effort to detain him.

52.     Mr. Hernandez told Officer Larson he had medical issues and had previously had surgery and had to get up and down in order to relieve his pain.

53.     Officer Johnson then assisted Officer Larson in the unlawful detainment.

54.     Both officers continued to grab Mr. Hernandez without probable cause and seized his person so that he was not free to leave.

55.     While under full control by Officers Larson and Johnson, and without doing anything to indicate a desire to flee, resist, or harm the arresting officers.

56.     Officer Johnson unnecessary delivered an elbow strike to Mr. Hernandez's face and Officer Larson delivered a strike to his torso with a closed fist.

57.     After being struck in the face by Officer Johnson, Mr. Hernandez was handcuffed while on the ground.

58.     Officers Larson and Johnson had no probable cause to detain Mr. Hernandez, nor did they have any reasonable suspicion that he committed any crime.

59.     Sergeant O'Neill, as the supervising officer on scene and witness to the incident, failed to intervene.

## SECOND CLAIM FOR RELIEF
**Violation of the Fourth Amendment of the United States Constitution**
**Excessive Force Resulting in Permanent Debilitating & Disfiguring Injury**
**(Against Officer Jayme R. Larson, Officer Vance Johnson, and Sergeant O'Neill)**

60.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

61.     A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officers intentionally restrains the freedom of a person to simply walk away.  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Without question, a seizure occurs when an officer grabs an individual by both wrists, and tells them they are not allowed to move freely, then another officer elbows that individual in the face causing them to fall to the ground where they are then placed in handcuffs. The amount of force used in Mr. Hernandez' apprehension and arrest was unnecessary, excessive, and shocks the conscience.

62.     Mr. Hernandez was seized the moment Officer Larson ran up to him as he exited his vehicle and instantly grabbed him, with the intent to place him under arrest, by both his wrists without warnings or commands.

63.     Both officers grabbed Mr. Hernandez without probable cause and seized his person so that he was not free to leave.

64.     Mr. Hernandez who was sixty years old at the time could barely stand due to ongoing medical issues and just having had intestinal surgery.

65.     While the officers forced Mr. Hernandez to submit to their unlawful detainment and pushed him against the side of the car, Officer Larson struck Mr. Hernandez with a closed fist to his torso.

66.     Officer Johnson also struck Mr. Hernandez with his elbow which dropped Mr. Hernandez to the ground.

67.     Sergeant O'Neill did nothing to intervene and stop his officers from engaging in a clearly unconstitutional and illegal assault on Mr. Hernandez.

68.     Mr. Hernandez had to receive medical treatment at the hospital for serious injuries to his face. Mr. Hernandez has had to have ongoing medical treatment as a result of his injuries.

69.     Sergeant O'Neill, as the supervising officer on scene and witness to the incident, failed to intervene. Sergeant O'Neill then approved the use of force and unlawful seizure.

70.     It must also be noted that Officer Larson was disciplined for Conduct Prohibited by Law based on this incident through an administrative proceeding with the Denver Police Department.

## THIRD CLAIM FOR RELIEF
### Malicious Prosecution
### (Against Officer Jayme R. Larson, Officer Vance Johnson, Sergeant O'Neill, and Detective Ashley Botello)

71.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

72.     The applicable elements that must be met to prevail on a sec. 1983 claim for malicious prosecution are, "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4)the defendant acted with

malice; and (5) the plaintiff sustained damages." *Novitsky v. City of Aurora*, 491F.3d 1244, 1258 (10th Cir. 2007).

73.     Malicious prosecution claims require the plaintiff to show those bringing the malicious prosecution did so with "intentional or reckless disregard for the truth." *Fletcher v. Burkhalter*, 605 F.3d 1091, 1095 (10th Cir. 2010).

74.     Officer Larson and Officer Johnson caused Mr. Hernandez's prosecution and confinement by intentionally making false statements in their police reports which directly led to the charges against Mr. Hernandez. The Defendant officers did this in order to justify their gratuitous beating Plaintiff, a disabled elderly man, and give them cover for inflicting visually disturbing injuries.

75.     The officers laughed loudly about the beating afterward, showing that they enjoyed beating Mr. Hernandez. It appears that the officers derived significant pleasure from beating, injuring, arresting and charging Mr. Hernandez. It is clear from the officers' statements after beating Mr. Hernandez that they "hadn't figured out" what they would charge him with, that he had not committed any identifiable criminal act, and that the officers were in the process of fabricating charges.

76.     The charges against Mr. Hernandez were dismissed by the Denver District Attorney's office.

77.     Mr. Hernandez was seized by both Officer Larson and Officer Johnson without probable cause that any crime had been committed. Mr. Hernandez was not charged with any crime other than assault on a peace officer, which was a result of false statements said to have occurred after the illegal seizure of Mr. Hernandez's person.

78.     Officer Larson and Officer Johnson, in an attempt to cover-up their illegal seizure and excessive use of force against Mr. Hernandez, made false statements with intentional disregard for

the truth, for their own pleasure, and to cover-up their illegal assault.

79.     For brevity's sake, this complaint will not list all the false statements but below are just a few in both Officer Larson's and Officer Johnson's reports:

    a.  Officer Larson stated in her reports that she "attempted to de-escalate the situation by placing [her] hands out and advising him to remain seated." This is not true. Officer Larson grabbed Mr. Hernandez before making any statements to him once he had stood up from a seated position.

    b.  Officer Larson then states he "refused to remain seated" and "stood up, advancing towards me." This is not true. Mr. Hernandez was standing up next to the vehicle door when Officer Larson grabbed him, Mr. Hernandez had not taken any steps towards Officer Larson.

    c.  Officer Larson stated, "I observed Hernandez Sr. lift his right wrist and begin to ball it into a fist, so I immediately grabbed it to simply control it." This is false. Mr. Hernandez was grabbed immediately after he stood up from the vehicle and at no time before being grabbed by Officer Larson did Mr. Hernandez raise his arms.

    d.  Officer Larson stated, "Hernandez Sr. swung his right leg back to gain momentum and intentionally struck Officer Johnson in the groin with his knee. In the process of doing so, he kicked me in the left shin causing pain." This is not true. Mr. Hernandez had just had surgery and was in severe pain and could hardly stand. He was physically incapable of kicking anyone or swinging his leg to gain momentum.

    e.  After Officer Larson punched Mr. Hernandez and Officer Johnson elbowed him in the face, Mr. Hernandez fell to the ground where Officer Larson states, "Hernandez Sr. kicked us in the legs again and began making verbal threats." This is false. Mr.

Hernandez was punched in the side of the body near where he just had surgery and was elbowed in the face then fell to the ground. As stated above, Mr. Hernandez was physically uncapable of kicking anyone due to his medical issues and his age.

f.  Officer Johnson states that he put Mr. Hernandez against the vehicle in an attempt to get handcuffs on behind Mr. Hernandez's back and while doing so Mr. Hernandez turned "slightly and delivered a hard knee strike directly to my groin." This is untrue and is contrary to the statement make by Officer Larson in her report. Mr. Hernandez was slammed against the side of the vehicle with two officers pushing against his body, in Mr. Hernandez fragile state and in pain, he was not able to turn and kick or knee anyone.

80.   Officer Larson and Officer Johnson not only fabricated probable cause to seize Mr. Hernandez, both officers, with an intentional disregard to the truth, lied in their reports about why they used the amount of force upon Mr. Hernandez and lied about being stuck by Mr. Hernandez which led to the charges against him.

81.   Sergeant O'Neill conducted a use of force investigation into Officer Larson's and Officer Johnson's actions and found "[n]o areas of operational improvements." The report further states both officers "were recognized for displaying professionalism and restraint" and "Officer Larson was further recognized for her calm, non-confrontational demeanor and attempt to de-escalate her initial interaction with Hernandez, Sr."

82.   Further, not only was Officer Larson's and Officer Johnson's excessive force approved by their Supervising Sergeant, who was on scene and witnessed the incident, Denver Police Department Detective Ashley Botello noted in her report that she reviewed the use of force reports and the body worn camera footage and "noted that everything in the report was accurate."

83.     But for the officers lying in their reports, Mr. Hernandez would not have been charged with any crime.

### FOURTH CLAIM FOR RELIEF
**Violation of Constitutional Rights under 42 U.S.C. §1983 Custom Amounting to a
Widespread Practice of Routine Excessive Force
(Against The City and County of Denver)**

84.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

85.     The City and County of Denver ("The City") has a long history and custom of using excessive.

86.     This custom "is a 'persistent and widespread' practice which 'constitutes the standard operating procedure of the local governmental entity.'" *Mitchell v. City and County of Denver,* 112 Fed.Appx. 662, 672 (10th Cir. 2004) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, (1989).

87.     In January 2017, the Office of the Independent Monitor highlighted several noteworthy deficiencies in the Denver Police Department's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

88.     There are dozens of additional documented claims and lawsuits against The City and/or its police officers going back well over ten years in which The City either paid settlements or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations. Recently, Attorney David Lane compiled a list of just some of those incidents, and the City's response, in a Complaint against The City captioned *Naphtali et al v. City and County of Denver,* Case No. 1:20-cv-02198. Plaintiff incorporates Mr. Lane's

Exhibit with his permission and incorporates all of the allegations therein as if set forth fully herein. The below information is summarized from the exhibit in that case:

a.  A North Denver News report issued in 2014 found that Denver has one of the highest rates of death due to legal intervention in the nation, second only to Baltimore.

b.  In 2015, Denver Police shot and killed Paul Castaway with little intervention to deescalate the situation. As custom, the officer involved was not prosecuted.

c.  In 2015, Denver Police shot and killed Jessica Hernandez who was in a vehicle reported stolen with other teens in the vehicle – there were no weapons present. The officers involved all shot at the vehicle eight times and were not charged by the Denver District Attorney. The City paid a $1,000,000 settlement to the Hernandez family after the family claimed Denver Police used excessive force.

d.  In 2015, Denver Police shot Sharod Kindell during a traffic stop in which Denver Police forced Mr. Kindell out of the vehicle. Denver Police shot Mr. Kindell as he fled unarmed. No officer was prosecuted or disciplined for their role in the shooting.

e.  In 2014, Denver Police shot Carlos Jurdo through a vehicle's window after a pursuit. The same officer who shot Sharod Kindell also shot Mr. Jurado as Mr. Juardo started to drive away. The individuals in the car were unarmed.

f.  In 2014, Denver Police shot Joseph Valverde during a sting operation. Upon disarming himself and obeying commands, Denver Police shot and killed Mr. Valverde while his hands were raised in the air. Denver Police released an immediate statement that the shooting was justified. The officer who shot Mr. Valverde made numerous false statements which were contradicted by the video evidence. The officer was not disciplined and was given an award. The officer was not prosecuted despite evidence

14

he unlawfully killed Mr. Valverde.

g.  In 2009, Vicki Lynn Trujillo filed a lawsuit against the Denver Police and The City for pursuing Jason Gomez without probable cause or suspicion. Mr. Gomez was unnamed and shot in the back perforating his spinal cord after he initially stopped for the officer's commands. Mr. Gomez was then shot multiple times after the initial shot and was hit in his chest, abdomen, thigh, and knee. Mr. Gomes later died from multiple gunshot wounds. The case was settled for $190,000.

h.  In 2015, Altagracia Medina Valencia filed a lawsuit on behalf of her deceased husband who Denver Police shot and killed after they were called for a self-inflicted knife wound. Officers tased Mr. Valencia-Lopez and he dropped the knife then shot him in front of his entire family. The case was settled for an undisclosed amount.

i.  In 2006, Denver Police shot and killed Frank Lobato after they entered his home without a warrant looking for another individual. Mr. Lobato was sleeping in his bed and was unarmed. Denver Police entered his room as he slept and shot and killed him. The case was settled for $900,000.

j.  In 2004, Denver Police shot and killed Paul Child, a fifteen-year-old who had special needs. Officers who responded to a call due to Mr. Child holding a knife, shot and killed Mr. Child through the front door of his home while Mr. Child stood in a hallway. Other officers on the scene had less lethal tasers but they were not used. Officers had been informed that Mr. Child had "special needs." The case was settled for $1.32 million.

k.  In 2004, Denver Police shot and killed Gregory Lee Smith, Jr., for holding a three-inch knife in his home after officers responded to a domestic call. The case was settled for

an unknown amount.

l.  In 2010, Marvin Booker was killed in the Denver jail. Officers involved in the killing of Mr. Booker took steps to cover up the murder by having meetings before speaking to investigators and hiding the taser used to kill Mr. Booker. A federal jury returned a verdict of guilty for the deputies involved, their Sergeant, and The City. The jury determined the death of Mr. Booker was willful, intentional, and malicious and awarded the family $4.65 million, of which $4.5 million was for punitive damages. Denver never disciplined the officers or their supervisors who were involved in the death of Mr. Booker. In this case, Denver stipulated that the individuals involved who engaged in policies and customs for The City which created Section 1983 liability for The City.

m.  In 2015, Michael Marshall was killed at the Denver jail when officers used excessive force on him buy piling on top of him causing him to vomit and go into cardiac arrest. Officers then put a spit mask on Mr. Marshall causing him to choke and die on his own vomit. The autopsy ruled that the cause of death was due to asphyxiation and blunt force trauma to the face. The City settled the case for $4.65 million. Officers involved received little punishment for the incident.

n.  Plaintiffs in *Ortega, et al, v. City and County of Denver, et al.*, 944 F. Supp. 2d 1033 (D. Colo. 2013) demonstrated that Denver officers use excessive force due to The City's inadequate training of officers on the use of force; failure to investigate complaints against officers; custom of tolerating officers' silence when force is used.

o.  In 2019, Denver Police officers beat Justin Lecheminant in his backyard after driving away from a traffic stop. Officers broke his nose and multiple ribs, punctured his

eardrum, and gave him a serious concussion.

p.  In 2017, Denver Police pulled over Kristyn Stonkas then beat her and her partner, Mr. Steele, after the couple yelled at the officers. Denver Police caused Ms. Stonkas to suffer a traumatic brain injury and torn vertebrae while also causing Mr. Steele a traumatic brain injury, collapsed lung, and broken rib. The City settled the case before it was ever filed in court for $500,000.

q.  In 2016, Denver Police tased and beat a homeless man, Gregory Heard, who was at the time complying with the officers' commands. An officer tased Mr. Heard, pushed him to the ground then shoved his face into the dirt. The Investigating Supervisor on scene, the same officer who tased Mr. Heard, knowingly prepared a false use of force report to cover up their actions. Denver Police determined that the officer's conduct was consistent with the policy of the department.

r.  In 2014, a Denver Police officer was fired for putting their knee into the neck of Servina Trujillo while in her cell. The City settled the excessive force lawsuit.

s.  In 2014, a Denver Police officer with at least nine excessive force complaints assaulted Brandon Schreiber at a bar and tore both of his rotator cuffs. The case was settled for $185,000.

t.  In 2013, Denver Police responded to a gas station where the owner, Bill Dau, called the police on a customer who tried to cash a bad money order a few days after the same customer did the same. When officers responded, they struggled to communicate with Mr. Dau, the owner who called the police. Officers then rushed and tackled Mr. Dau and placed him in handcuffs. Mr. Dau was charged with Second Degree Assault and Criminal Extortion, but the charges were later dropped. The City settled the case in

2016 for $50,000.

u.  In 2012, Philip White, who is a blind 77-year-old man, was beat by a Denver Police officer at a bus station. The officer slammed Mr. White's head into a machine causing a bloody gash on his head then placed handcuffs too tightly on Mr. White. Denver Police found the officer did not violate the department's policy and did not use excessive force. A federal jury concluded that the officer did in fact use excessive force and awarded Mr. White $400,000; $100,000 in compensatory damages and $300,000 in punitive damages. The City also paid hundreds of thousands of dollars in attorney fees.

v.  In 2011, the Martinez family filed suit against the Denver Police for entering their home without a warrant or consent then beating members of the family including throwing a family member through a window, punching another member in the face without provocation, and dragging another family member from the home and slamming them on the concrete before applying handcuffs. Members of the family were charged criminally but a jury acquitted them on all counts. A federal jury awarded the family $1.8 million.

w.  In 2011, during a routine traffic stop of Mr. Landau, Denver Police handcuffed his passenger, Addison Hunold, for a small amount of marijuana. Officers then began searching Mr. Landau's vehicle and tried to get into the trunk of the car. Mr. Landau asked the officers if they had a warrant to search the trunk. At that time, officers grabbed Mr. Landau's arms and beat him in the face with their fists and a flashlight while yelling racial epithets. After EMTs arrived on scene and found Mr. Landau lying on the ground while bleeding from the head, he was treated at the hospital for a broken

nose, lacerations, serious closed head injuries, hematoma, concussion, and a hemorrhage in his eye. Officers on scene forced an eyewitness to sign a false statement and filed it with their reports. No officers were disciplined for this incident. The City settled this case for $795,000.

x.   In 2010, Jared Lunn tried to report an assault to a Denver Police officer who then ignored Mr. Lunn. Mr. Lunn stated "way to protect and serve" then tried to get back into a vehicle. The officer then grabbed Mr. Lunn, choked him unconscious and kicked his legs out from underneath him slamming onto the ground then yelling homophobic slurs at Mr. Lunn. Mr. Lunn was not cited for any law violation. They City settled this case for $45,000.

y.   In 2010, Rohit Mukherjee was beat by Denver Police who responded to Mr. Mukherjee's home while he was hosting a party. Denver Police pushed open the door when Mr. Mukherjee would not come outside, grabbed him, slammed him on the floor, stood on his legs, pushed his face into the carpet so hard it caused visible injuries, and slammed his head into walls as they walked him out of the building. Mr. Mukherjee's guests attempted to film the assault at which point one of the officers took their phones and dumped them in a bowl of water to destroy the evidence. They City settled the case for an undisclosed amount.

z.   In 2010, Denver Police officers jumped Chad Forte in his apartment building leaving him with facial injuries. Denver settled this case for $22,500.

aa.   In 2010, Robert Duran sued The City for excessive force when deputies beat him in the detention center while he was waiting for the elevator. A deputy slammed Mr. Duran's head in the wall, dragged him ten feet, handcuffed him, then kicked in him his face and

body. Mr. Duran won a jury trial for this incident was awarded $40,000 plus interest and over $217,000 in attorney's fees.

bb. In 2010, Tyler Mustard was chased, beat in the head, neck, and body, and charged for spray-painting a van. The charges against Mr. Mustard where dismissed. Denver settled the case for $117,000.

cc. In 2010, Denver Police followed John Crespin home after he witnessed officers using excessive force on a group of children. An officer kicked Mr. Crespin's legs out from under him, placed him in a chokehold, handcuffed him, then beat him with batons for roughly fifteen-to-twenty minutes. The case settled for an undisclosed amount.

dd. In 2010, Denver Police beat Eric Winfield causing chipped teeth, scars, and nerve damage in his hands. Denver settled the case for $40,000.

ee. In 2010, Denver Police beat James D. Moore, who officers were told was the wrong guy at the scene. An officer tackled Mr. Moore from behind without warning or provocation. The officer then proceeded to beat Mr. Moore to the point that he lost consciousness and his heart stopped. The officer continued to beat him even after he was restrained. Mr. Moore suffered life-long injuries and now walks with a cane. The City settled this case in 2015 for $860,000.

ff. In 2009, Denver Police beat Mark Ashford who told an officer he would testify that he saw a car stop at a stop sign after the officer had pulled over the vehicle for not stopping at a stop sign. The officer grabbed his phone while Mr. Ashford took photos of the scene then started punching Mr. Ashford to get him on the ground. Mr. Ashford had to be taken from the scene by ambulance. He was charged with several crimes which were later dismissed. In 2011, The City settled the excessive force case for $35,000.

gg. In 2009, Alberto Romero was killed by Denver Police after he was repeatedly tased and beat when arrested wearing only boxer shorts. Mr. Romero suffered broken ribs and a split tongue from the excessive force. The City settled the case for $225,000.

hh. In 2009, a Denver Police officer struck Danvis Smith in the face through the window of Mr. Smith's vehicle. The officer then pulled Mr. Smith out the vehicle and handcuffed him in position that caused a torn rotator cuff, torn bicep tendon, and caused chronic back pain. Mr. Smith was charged with several crimes which were later dismissed. The City settled this case for undisclosed amount.

ii. In 2009, Denver Police forcefully entered the home of James B. Bouchard without a warrant or consent. Officers restrained Mr. Bouchard with a nightstick then shoved him into a wall and handcuffed him resulting in injuries to his rotator cuff and other injuries to his torso. This case settled before trial.

jj. In 2009, Denver Police responded to a diner where a woman had been assaulted in the bathroom. The victim of the assault along with three other women were then assaulted by Denver Police officers. Officers maced all the women, handcuffed them, then proceeded to further brutalize two of the women who were handcuffed. In order to cover-up the excessive force, The City prosecuted the women. No officer was disciplined or fired. The City settled the case for $360,000.

kk. In 2009, Wayne C. Rose was fleeing while unarmed and was knocked over by an officer on foot then ran over by an officer on motorcycle. Mr. Rose was knocked unconscious and placed in handcuffs then picked up by his arms which were behind his back. Officers dropped Mr. Rose onto the pavement several times causing facial injuries and injuries to his body. He was then kicked repeatedly. Mr. Rose suffered a broken arm

21

and had to have multiple surgeries. This case settled for an undisclosed amount.

ll. In 2009, James R. Watkins was beat by Denver Police who were following him. Officers hit him in the face with closed fists and their elbows. Officers continued to beat Mr. Watkins after he was restrained. Mr. Watkins was initially charged with Assault on the Second Degree, but the charges were later dismissed. The City settled this case for $20,000.

mm.   In 2009, Denver Police beat Michael DeHerrera for calling his father, a Pueblo Police Officer, to inform him that Denver Police were assaulting his friend. Denver Police then beat Mr. DeHerrera by slamming him to the concrete face first, using an impact weapon on him multiple times, and striking him in the face multiple times. Despite the incident being caught on video, the officers were only briefly terminated by the Manger of Safety based on their excessive force and false reports but then reinstated. This case settled for $17,500.

nn. In 2009, Shawn Kyeone called the Denver Police to report being assaulted by a bouncer at a night club. When officers arrived, they too began to assault Mr. Kyeone by hitting him with closed fists and elbows in the face even after he was restrained. Mr. Kyeone suffered head trauma and facial contusions. Denver settled this case for $15,000.

oo. In 2009, Jason Anthony Graber was called a "dumbass" by Denver Police in a marked squad car while he and his family were trying to cross the street at the 16th Street Mall. Mr. Graber told the officer he did not appreciate being called names, so the Denver Police officer got out of the squad car, tackled Mr. Graber then slammed his body down on the concrete casing knee and leg injuries. Mr. Graber was detained for public intoxication with a blood alcohol level of 0.036 (well below the legal limit). Mr. Graber

suffered long-term injures to his knee and leg. The judge in this case determined that Denver impeded the discovery process by refusing to produce use of force documents for Denver police personnel. In 2011, the case settled for $225,000.

pp. In 2009, John Stephen Heaney was assaulted by an undercover Denver Police officer while riding his bike near Coors Field on opening day. Mr. Heaney was forced to the ground then punched repeatedly in the head and had his head slammed on the pavement breaking two of his teeth. The case settled.

qq. In 2008, a Denver Police officer used a fence as leverage to jump up and down on Mr. Vasquez who was a sixteen-year-old child. The officer lacerated his liver and broke his ribs. The City settled this case for $885,000.

rr. In 2007, Ross Edwards Smith went to the 16th Street Mall to protest the Iraq war and was assaulted by multiple Denver Police officers. Mr. Smith was punched in the face, thrown to the ground then had his face pushed into the pavement while an officer kneeled on his back. Mr. Smith was charged with interference, but the charges were dismissed. Mr. Smith suffered cuts, bruises, and aggravation of his Parkinson's Disease which caused severe and uncontrollable tremors. This case settled for an undisclosed amount.

ss. In 2006, Chandler Lyles called the Denver Police to investigate his mother possibly being suicidal. An officer asked Mr. Lyles to sit on the couch which he did. Without provocation, an officer tackled Mr. Lyles to the ground and handcuffed him breaking his clavicle. This case settled for an undisclosed amount.

tt. In 2006, Hirut Berhanmeskel was violently arrested by a Denver Police officer for crying about her inability to pay a parking ticket. The officer slammed Ms.

Berhanmeskel against the wall and twisted her arm to the point her wrist broke. This case settled for an undisclosed amount.

uu. In 2005, David Nettles was unlawfully arrested when Denver Police responded to a domestic call across the street from Mr. Nettles' home. Officers punched Mr. Nettles then used nunchucks on his ankles causing him to fall. While on the ground, an officer kicked him and yelled, "when we give an order, you obey it!" Officers continued to punch Mr. Nettles and yell, "you did this to your own self!" Officers then handcuffed Mr. Nettles and, in the process, broke his shoulder, while officers continued to hit Mr. Nettles in the head and kick him in the back. This case settled for an undisclosed amount.

vv. In 2005, Denver Police pepper-sprayed a car full of people who could not move their car out of a full parking lot. When the occupants of the car got out, an officer again pepper-sprayed Quincy Michael Shanno. Mr. Shanno called 9-1-1 and began to describe what was happening. While on the phone with 9-1-1, an officer pepper-sprayed Mr. Shannon again then kicked his feet out from under him and shoved his face into the concrete. Mr. Shannon was then handcuffed with his hand over one of his ankles which was pulled up behind his back. Mr. Shannon was them picked up by another officer and pepper-sprayed again in the face. This case settled for an undisclosed amount.

ww. In 2004, a Denver Police officer hit Richard Rra-Shada with his squad car. Mr. Rra-Shada then responded with profanity. At this point, the officers in the car got out of the vehicle, slammed him to the ground and began hitting Mr. Rra-Shada with a nightstick while another office was punching him in the head. Mr. Rra-Shada suffered injuries to

his shoulders, back, writs, ribs, and abdomen. This case settled for an undisclosed amount.

xx. In 2004, a Denver Police officer followed Terrill Johnson to his home then crashed into Mr. Johnson's wife's car. When Mr. Johnson went to inspect the car, officers exited their squad car with guns drawn. Mr. Johnson was unarmed. Officers then slammed Mr. Johnson to the ground, punched him, and placed him in handcuffs all while using racial slurs. Mr. Johnson was charged with two traffic offenses that were later dropped.

89.     In recent years, various high-profile cases anecdotally put a measure on this problem: The City paid out well more than $17 million as a result of either jury verdicts or settlements based upon violations of the Fourth Amendment to the United States Constitution. [1]

90.     Further, in the period between 2004 and September 2010, The City expended nearly $6.2 million in settlements of lawsuits involving police officers, as reported by Denver City Attorney David Fine.  Nearly all those payouts were for allegations of excessive force.[2]

91.     Federal Courts have also frequently recognized The City's policies and practices are unconstitutional. As recently as July 13, 2020, in an excessive force case, Judge Kane denied The City's motion to dismiss a *Monell* claim, holding that it is a question of fact whether The City trains and supervises or disciplines its officers sufficiently and predictably so that they understand what they can and cannot do when using force. Civil Action No. 16-cv-02327-JLK *Talley v. City and County of Denver, et.al.*

92.     The City, despite the years and years of abhorrent and escalating excessive force by its officers, continues to fail to train, discipline, or even acknowledge the conduct perpetuated by their

---

[1] This estimate is very far from exact but includes Fourth Amendment cases that undersignedcounsel is aware of concerning various individuals.
[2] Council members had asked Fine to research litigation patterns after controversy erupted over avideo that showed an officer beating a 23-year-old man who was talking on a cell phone.

officers, in violation of the Constitution and with complete disregard to Coloradans.

93.     The City is deficient in training officers on the use of force consistent with the Constitution, devoid in properly investigating claims of excessive force, and fails to discipline officers when evidence is presented determining that officers' conduct was unreasonable.

94.     The City perpetuates the custom of the "code of silence" from its officers by allowing the culture of silence and false narratives to persist throughout the many years of ongoing lawsuits which have highlighted these issues time and time again.

95.     Not only are these apparent customs and policies disregarded, in violation of the Constitution, The City has a widespread custom of rewarding behavior which violates the Constitution; thereby, encouraging officers to continue and escalate their unlawful behavior.

96.     In an effort to cover-up unlawful excessive force, Denver Police, as noted in the cases above, charge the victims of excessive force with criminal charges. In most, if not all those cases, the charges are either dismissed before trial or the individuals are acquitted at trial for the false charges.

97.     This custom is continuing to prevail despite the numerous settlements and jury verdict sthe City has paid out.

98.     In the present case, Sergeant O'Neill conducted a use of force investigation into Officer Larson's and Officer Johnson's actions and found "[n]o areas of operational improvements." The report further states both officers "were recognized for displaying professionalism and restraint" and "Officer Larson was further recognized for her calm, non-confrontational demeanor and attempt to de-escalate her initial interaction with Hernandez, Sr."

99.     In the present case, not only was Officer Larson's and Officer Johnson's excessive force approved by their Sergeant, who was on scene and witnessed the incident, Denver Police

Department Detective Ashley Botello noted in her report that she reviewed the use of force reports and the body worn camera footage and "noted that everything in the report was accurate."

100.    Mr. Hernandez was charged with two counts of assault on a peace officer, but those charges, like many cases before his where an individual was the victim of excessive force by Denver Police, were dismissed by the District Attorney.

101.    This custom to undersign anything that officers report regarding their use of force, even when clearly false or in violation of the Constitution, is the "persistent and widespread" practice that continues "the standard operating procedure of the local governmental entity" to perpetually violate individual's Constitutional rights by using excessive force causing injury.

102.    The customs of The City continually undermining the need for intervention regarding the standard operating procedure when it comes to excessive force is the direct and proximate cause of Mr. Hernandez's injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor on each of his respective claims and against Defendants jointly and/or severally as follows:

a.  Compensatory damages in an amount that will fully and fairly compensate the Plaintiff for her respective injuries, damages and losses pursuant to 42 USC 1983.

b.  Punitive damages pursuant to federal law as punishment and deterrence against the commission of future such conduct.

c.  Pre- and post-judgment interest.

d.  Reasonable attorneys' fees, expert witness fees, and the cost of this action pursuant to 42 USC 1988 and any other applicable federal or state law.

e.  Any other relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 8th day of June, 2021.

BAUMGARTNER LAW, L.L.C.

*s/ S. Birk Baumgartner*
S. Birk Baumgartner
Adam R. Yoast
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (303) 529-3476
Fax: (720) 634-1018
birk@baumgartnerlaw.com
adam@baumgartnerlaw.com

*Counsel for Plaintiff*

Plaintiff's address:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113