**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-01538-PAB-MEH

AARON HERNANDEZ,

     Plaintiff,

v.

OFFICER JAYME R. LARSON, in their individual capacity,
OFFICER VANCE JOHNSON, in their individual capacity,
SERGEANT MICHAEL O'NEILL, in their individual capacity,

     Defendants.

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Defendants Larson, Johnson, and O'Neill ("Defendants")[1], move for summary judgment on claims 1, 2, and 3[2] of the Amended Complaint [Doc. #4] under Fed. R. Civ. P. 56 and qualified immunity.[3]

## INTRODUCTION

Plaintiff was arrested for two counts of assault in Denver, Colorado on June 30, 2019. He asserts various constitutional theories against the officers present during the arrest. Specifically, he claims (a) Defendants lacked reasonable suspicion and/or probable cause to detain him or believe he committed a crime; (b) Ofcs. Johnson and Larson used excessive force; (c) Sgt. O'Neill failed to intervene; and

---

[1] On December 21, 2022, the Court granted a *Stipulated Motion to Dismiss Defendant Ashley Botello Without Prejudice* [Doc. #53]. Therefore, this Motion does not refer to claims against Ofc. Botello. All arguments are reserved on Botello's behalf, including qualified immunity, should the need arise.

[2] Plaintiff's Amended Complaint [Doc. #4] contains no specific claim against Sgt. O'Neill for failure to intervene; however, Claims 1 and 2 allege he "failed to intervene." It is assumed for purposes of this Motion that Plaintiff's intent is to assert this as a separate claim against Sgt. O'Neill.

[3] Plaintiff's Fourth Claim for Relief was previously dismissed. [Doc. #41.]

(c) malicious prosecution. Summary judgment is proper because: Defendants had reasonable suspicion to approach the vehicle, probable cause to detain Plaintiff, and probable cause to arrest Plaintiff; no excessive force was used; Defendants are entitled to qualified immunity as no constitutional violation occurred and the law was not clearly established; Plaintiff cannot show Sgt. O'Neill failed to intervene; and Plaintiff's malicious prosecution is without merit.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

For purposes of this Motion, the following relevant facts are undisputed:

1.  Defendants are Denver Police Department ("DPD") officers who were present at the arrest of Plaintiff. [Doc. #23, ¶¶ 5-7.]

2.  On June 30, 2019, while providing extra patrol to an address recently declared a public nuisance, Sgt. O'Neill observed a male in a vehicle in the church parking lot directly next door. *See Statement of Sgt. O'Neill*, dated July 2, 2019, p. 1 (attached as **Ex. A**). The church was closed, nobody was attending any services, and the male was parked directly next to a church van which had one of its windows broken out. *Id.*

3.  Sgt. O'Neill ran the vehicle's license plate number and learned the registered owner had an active felony warrant. *Id.*; *see also Deposition of Michael O'Neill*, 59:9-12, 60:5-8 (attached as **Ex. B**).

4.  As Sgt. O'Neill approached, Plaintiff jumped out from the passenger side and approached Sgt. O'Neill while yelling: "What do you want? This is private property." **Ex. B**, 61:14-16, 62:7-8.

5.  Sgt. O'Neill instructed Plaintiff to return to the vehicle three times before he complied. *Body Worn Camera ("BWC") of Michael O'Neill*, 54:06-54:15 (attached as **Ex. C**).

6.  When Plaintiff finally returned to the vehicle, Sgt. O'Neill observed him immediately reach under his seat. **Ex. B**, 63:9-15. This led Sgt. O'Neill to believe Plaintiff was placing something or retrieving something from under the seat. *Id.* at 64:8-10.

7. Sgt. O'Neill then made contact with the individual in the driver's seat, later determined to be Plaintiff's son, Aaron Hernandez, Jr. ("Hernandez, Jr."), who claimed he had permission to be at the church from his pastor and that he "hates cops." *Id.* at 67:16-20, 68:1.

8. Sgt. O'Neill spoke to the pastor of the church on the phone who confirmed Hernandez, Jr. had permission to be there, but Plaintiff did not. *Id.* at 70:2-8.

9. Ofcs. Johnson and Larson arrived after Sgt. O'Neill requested back-up. *Deposition of Jayme Larson*, 64:13-15, 66:3-4 (attached as **Ex. D**); *Deposition of Vance Johnson*, 28:22-23 (attached as **Ex. E**).

10. Ofc. Larson was the cover officer. **Ex. D**, 136:22-24. Her role was to cover the lead officer, ensure scene security for officer safety, and assist in watching other parties. *Id.* at 137-1-6.

11. Ofc. Larson understood Sgt. O'Neill was with a person wanted on a warrant, which "has the propensity to increase the potential for violence and risk." *Id.* at 66:25, 67:1-15.

12. Sgt. O'Neill also informed Ofc. Larson that the passenger—Plaintiff—had been "digging or placing his hands under" the passenger seat and expressed concern that Plaintiff could possibly grab a weapon or he was hiding something. **Ex. B**, 66:1-9, 69-5-9.

13. Ofc. Larson positioned herself behind the middle pillar of the vehicle and watched Plaintiff. **Ex. D**, 69:11-13.

14. Sgt. O'Neill and Ofc. Johnson stood with Hernandez Jr. at the rear of the vehicle on the driver's side and placed him under arrest for the felony warrant. **Ex. C**, 5:00-5:12; **Ex. E**, 47:10-18.

15. Plaintiff then leaned up from his reclined chair, looked over his left shoulder where his son was being arrested, and began exiting the vehicle. **Ex. D**, 72:4-7; *see also BWC of Jayme Larson*, 00:35-38 (attached as **Ex. F**).

16. As Plaintiff exited the vehicle, Ofc. Larson approached him in attempt to deescalate the situation and placed her right hand out as she pointed inside the vehicle and said "eh, eh, eh." **Ex. D**,

80:10-20, 81:3-13; **Ex. F**, 00:38 – 00:42.

17. In response, Plaintiff briefly hesitated and did not exit the vehicle immediately. **Ex. D**, 82:13-16. Plaintiff later testified he understood this command to mean he was being told to stop what he was doing and stay in the vehicle. *Deposition of Aaron Hernandez,* 69:21-25, 70:1-6 (attached as **Ex. G**).

18. Despite being instructed to stay in the vehicle and comprehending this instruction, Plaintiff ignored Ofc. Larson's commands and proceeded to exit the vehicle. **Ex. D**, 82:25, 83:1, 87:2-4, 87:16-20; **Ex. F**, 00:38-41. Plaintiff swung his left leg outside of vehicle (toward Ofc. Larson), followed by his right leg (toward Ofc. Larson), stood up, and rotated his upper body, advancing toward Ofc. Larson. **Ex. D**, 82:25, 83:1, 87:2-4, 87:16-20; **Ex. F**, 00:40-43.

19. As Plaintiff lifted himself out of the vehicle, his right wrist rose with his body, and his right hand began to make a fist. **Ex. F**, 00:40-46.

20. Interpreting this as aggression and concerned about Plaintiff attempting to interfere in the arrest of Hernandez Jr., Ofc. Larson stepped in front of Plaintiff to prevent him from moving forward, grabbed his wrist to control his movement, and ordered him to stop. **Ex. D**, 82:25, 83:1-6, 88:23-24, 96:17-19, 104:5-6, 108:16-19; **Ex. F**, 00:41-43. This angered Plaintiff. **Ex. D**, 102:9-10.

21. Plaintiff immediately grabbed Ofc. Larson and pushed her off him. *Id.* at 90:24-25, 91:1; **Ex. G**, 71:7-12, 72:7-13, 103:25, 104:1; **Ex. F**, 00:45-47.

22. Having heard raised voices and observed Ofc. Larson and Plaintiff struggling, Ofc. Johnson proceeded around to the passenger side of the vehicle. **Ex. E**, 27:7-23. 28:1-4.

23. Ofc. Johnson saw Plaintiff's hands balled in fists and perceived him as a threat. *Id.* at 27:7-23.

24. To assist Ofc. Larson, Ofc. Johnson grabbed Plaintiff's arm and escorted him away from the open passenger door of the vehicle to get him away from any potential weapons. **Ex. E**, 55:16-20.

25. Ofc. Larson instructed Plaintiff twice to put his hands behind his back. **Ex. F**, 1:02-07.

26. Plaintiff ignored this command, tensed up, and pulled away from the officers. **Ex. D**, 29:15-17; **Ex. G**, 78:7-10.

27. Plaintiff turned his body toward Ofc. Johnson and struck him with his knee hard in the groin, causing immediate pain. **Ex. E**, 30:16-21.

28. Ofc. Johnson can be heard saying: "knee me in the balls, what the fuck is wrong with you?" **Ex. F**, 1:37-1:42. Plaintiff responded: "I can't help it." *Id.*

29. Ofc. Johnson believed the strike to his groin to be intentional given he had "never seen something like that happen on accident, and it was with such force and hurt so much…." **Ex. E**, 30:23-24, 31:2-4.

30. In the process of kneeing Ofc. Johnson in the groin, Plaintiff also kicked Ofc. Larson in the shin, causing pain. **Ex. D**, 122:7-11; *BWC of Vance Johnson,* 2:09-2:11 (attached as **Ex. I**); *Statement of Ofc. Larson*, dated June 30, 2019 (attached as **Ex. J**).

31. Prior to using any force, Ofc. Larson attempted to deescalate the situation by speaking in a non-confrontational, friendly tone and repeatedly telling Plaintiff to stop and put his hands behind his back. **Ex. D**, 126:8-11.

32. But after being kicked coupled with Plaintiff repeatedly refusing to comply, Ofc. Larson struck Plaintiff once in the side to get his hands behind his back and effectuate an arrest. *Id.* at 126:1-16.

33. After being struck in the groin, Ofc. Johnson was afraid if he "didn't take immediate action to stop that assault, that [Plaintiff] would continue to assault either or both of [them]." **Ex. E**, 41:21-25, 42:1-3.

34. Ofc. Johnson then applied an elbow strike to Plaintiff's face. *Id.* at 39:9-10.

35. At that point, Plaintiff was placed under arrest. **Ex. D**, 126:11-16.

36. Sgt. O'Neill did not hear any of the commands given by Ofcs. Larson or Johnson, nor did he

witness any use of force. **Ex. B**, 89:2-8.

37. The interaction of Plaintiff's knee strike to Ofc. Johnson's groin and kick to Ofc. Larson's shin, followed by Ofc. Johnson's elbow strike and Ofc. Larson's punch lasted approximately ten seconds. **Ex. C**, 5:40-5:50.

38. The amount of time that lapsed from the moment Ofc. Larson approached Plaintiff until the moment he was placed in handcuffs was 56 seconds. **Ex. F**, 00:40-1:36.

39. Plaintiff was ultimately charged with Assault 2 – Police Officer, a felony, and Assault 3 – First Responder, a misdemeanor. *See County Court Case Summary*, dated August 7, 2019 (attached as **Ex. H**).

<u>**STANDARD OF REVIEW**</u>

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Fed. R. Civ. P. 56 (a) provides the Court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

When qualified immunity is raised in a motion for summary judgment, the motion is treated differently from other summary judgment motions. *Farell v. Montoya*, 878 F.3d 933, 936 (10th Cir. 2017). To survive a qualified immunity defense, a plaintiff must "demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)). This is a heavy two-part burden and if the plaintiff fails to satisfy either prong of the inquiry, the Court must grant qualified immunity. *Farell,* 878 F.3d at 937; *Albright v. Rodriguez,* 51 F.3d 1531, 1535 (10th Cir. 1995). If the plaintiff meets this burden, the defendant can preserve their entitlement to qualified immunity only by showing "that there are no disputes of material fact as to whether his conduct was objectively reasonable in light of clearly

established law and the information known to the defendant at the time." *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir.1996); *Felders ex rel. Smedley v. Malcolm*, 755 F.3d 870, 877 (10th Cir. 2014).

In this case, Plaintiff cannot satisfy his heavy burden and summary judgment is proper.

## ARGUMENT

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Government actors are protected by qualified immunity unless "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). Put differently, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, to overcome the defense of qualified immunity, Plaintiff must meet the heavy burden of showing (1) a reasonable jury could find Defendants violated his constitutional rights, and (2) the right at issue was clearly established at the time of alleged unlawful conduct. *Farell*, 878 F.3d at 937.

I. **Defendants are Entitled to Qualified Immunity on Plaintiff's First Claim for Relief Because They Had Probable Cause.**

In his First Claim, Plaintiff alleges Defendants violated the Fourth Amendment because they lacked both reasonable suspicion he committed a crime and probable cause to detain him. [Doc. #4, ¶ 57.] The evidence demonstrates Defendants are entitled to qualified immunity on this Claim.

A. Reasonable Suspicion Existed to Approach the Subject Vehicle.

The circumstances necessary to arouse reasonable suspicion fall considerably short of satisfying a preponderance of the evidence standard. *U.S. v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014) (citing *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002)). It must meet only a "minimum level of objective justification." *U.S. v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) (quotation omitted). In analyzing reasonable suspicion, a court does not "consider each of an officer's observations in isolation, but rather" considers "the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *Garcia*, 751 F.3d at 1143 (quotation omitted); *U.S. v. Fager*, 811 F.3d 381, 386 (10th Cir. 2016). The totality of the circumstances test looks at the officer's knowledge and observations as well as the circumstances in which the officer is working. *Rice*, 483 F.3d at 1084-85.

Here, Sgt. O'Neill observed a vehicle parked in a church parking lot under suspicious circumstances. **Ex. A**, p. 1. He ran the license plate number and discovered the registered owner had an active felony warrant. *Id.* 59:-9-12, 60:5-8. Based on these circumstances alone, it cannot be disputed that reasonable suspicion existed to approach the vehicle at the onset.

B.  Ofc. Larson Had Probable Cause to Detain Plaintiff.

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)); *see also A.M. v. Holmes*, 830 F.3d 1123, 1138 (10th Cir. 2016).

Ofc. Larson was called to the scene as a cover officer and understood Sgt. O'Neill was with a person wanted on a felony warrant. **Ex. D**, 66:25, 67:1-15, 136:22-24. Ofc. Larson's training taught her this situation had "the propensity to increase the potential for violence and risk." *Id.* at 66:25, 67:1-

15. She was also told by Sgt. O'Neill that the driver (Hernandez Jr.) had an active warrant and the passenger (Plaintiff), after being instructed to return to the vehicle, had been seen "digging or placing his hands" under the passenger seat. *Id.* at 69:5-9. This information was passed along to Ofc. Larson as there was concern Plaintiff may have a weapon or have access to a weapon. **Ex. B**, 66:1-9.

As a cover officer, it was Ofc. Larson's responsibility to ensure the scene was secure for officer safety. **Ex. D**, 137:1-6. For that reason, after being informed of Plaintiff's conduct she positioned herself behind the middle pillar of the vehicle and watched Plaintiff as Sgt. O'Neill and Ofc. Johnson placed Hernandez Jr. under arrest. *Id.* at 69:11-13; **Ex. C**, 5:00-5:12; **Ex. E**, 47:10-18. Plaintiff then began exiting the vehicle, despite being previously told to stay in the vehicle multiple times by Sgt. O'Neill. **Ex. C**, 54:06-54:15. Ofc. Larson immediately (and again) instructed Plaintiff to stay in the vehicle—an instruction he understood. **Ex. D**, 80:10-20, 81:3-13; **Ex. F**, 00:38 – 00:42; **Ex. G**, 69:21-25, 70:1-6. Plaintiff ignored Ofc. Larson, got out of the vehicle, and advanced toward Ofc. Larson. **Ex. D**, 82:25, 83:1, 87:2-4, 87:16-20; **Ex. F**, 00:38-43. Ofc. Larson, interpreting Plaintiff's actions as aggressive and concerned about Plaintiff trying to interfere with the arrest, stepped in front of Plaintiff to prevent him from moving forward, grabbed Plaintiff's wrist to control his movement, and ordered him to stop. **Ex. D**, 82:25, 83:1-6, 88:23-24, 96:17-19, 104:5-6, 108:16-19; **Ex. F**, 00:41-43. Plaintiff was effectively detained at this moment and appeared to be angry. **Ex. D**, 102:9-10.

The totality of the circumstances indicates Ofc. Larson had probable cause to detain Plaintiff. The scene had the propensity for violence given the involvement of a felony warrant; Plaintiff had disobeyed multiple orders regarding going back to or staying in the vehicle; Plaintiff may have had access to a weapon; Plaintiff advanced toward Ofc. Larson, which she interpreted as aggressive; Ofc. Larson was concerned, given Plaintiff's actions, that he may interfere with the arrest; and Plaintiff appeared angry. *Keylon v. City of Albuquerque*, 535 F.3d at 1216.

C.  Ofcs. Johnson and Larson Had Probable Cause to Arrest Plaintiff.

In the context of a qualified immunity defense on an unlawful arrest claim, the threshold inquiry is whether there is 'arguable probable cause' for the challenged conduct. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). Arguable probable cause is another way of saying the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. *Id.* (citing *Cortez v. McCauley,* 478 F.3d 1108, 1120 (10th Cir. 2007)). A defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Id.*

After being detained, Plaintiff was clearly angry, and he immediately pushed Ofc. Larson. **Ex. D**, 90:24-25, 91:1, 102:9-10; **Ex. G**, 71:7-12, 72:7-13, 103:25, 104:1. Ofc. Johnson heard raised voices, observed Ofc. Larson and Plaintiff struggling and went to assist. **Ex. E**, 27:7-23, 28:1-4. Ofc. Johnson was concerned for Ofc. Larson's safety because he saw Plaintiff's hands balled into fists and Ofc. Larson trying to control him. *Id.* at 27:16-23. Ofc. Johnson grabbed Plaintiff's arm and escorted him away from the open passenger door to get him away from potential weapons. *Id.* at 55:16-20. Plaintiff was instructed to put his hands behind his back, yet another command he disobeyed. **Ex. F**, 1:02-07. Plaintiff tensed up, pulled away, turned his body to Ofc. Johnson, and struck him with his knee hard in the groin, causing immediate pain. **Ex. E**, 30:16-21; **Ex. G**, 78:7-10. Ofc. Johnson interpreted this overt action as intentional. **Ex. E**, 30:23-24, 31:2-4. In the process of kneeing Ofc. Johnson, Plaintiff kicked Ofc. Larson in the shin, causing pain. **Ex. D**, 122:7-11; **Ex. I,** 2:09-2:11; **Ex. J**.

The totality of the circumstances demonstrates the existence of probable cause as Plaintiff had committed a crime(s) at this point—he disobeyed numerous orders and assaulted two police officers. *See Keylon*, 535 F.3d at 1216. But even if the Court were to determine probable cause did not exist, it cannot be disputed that Ofcs. Johnson and Larson had arguable probable cause to arrest Plaintiff give the circumstances, and this is enough for qualified immunity. *Stonecipher*, 759 F.3d at 1141.

II. **Defendants Are Entitled to Summary Judgment on Plaintiff's Second Claim for Relief Because No Excessive Force Was Used.**

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. Excessive force by law enforcement is a "seizure" under the Fourth Amendment. *See Holland ex re. Overdorff v. Harrington*, 268 F.3f 1179, 1186 (10th Cir. 2001). In evaluating whether force is constitutional, the inquiry is whether the officer's actions are "*objectively reasonable* in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (emphasis added). To survive summary judgment, Plaintiff "must show both that a 'seizure' occurred, and that the seizure was 'unreasonable.'" *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989).

Whether an officer acted reasonably is determined by evaluating the totality of the circumstances. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). The factors bearing on this determination include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Fogarty v. Gallegos*, 523 F.3d 1147, 1159-60 (10th Cir. 2008). In conducting its analysis, the court must view the evidence from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cortez*, 478 F.3d at 1125. This approach accounts for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see also Phillips v. James*, 422 F. 3d 1075, 1080 (10th Cir. 2005) ("What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time."); *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001). Because the applicable standard is strictly objective, the officer's subjective intent or motivation in deciding to use the force at issue should *not* be considered;

"[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officers' good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

Here, after the events described in Section I(C) above took place—which involved Plaintiff assaulting Ofcs. Johnson and Larson—Ofc. Larson again instructed Plaintiff to put his hands behind his back, which he repeatedly refused to do, and then struck Plaintiff once in the side to get Plaintiff's hands behind his back and effectuate an arrest. **Ex. D**, 126:1-16. After being struck in the groin, Ofc. Johnson was afraid if he "didn't take immediate action to stop that assault, that [Plaintiff] would continue to assault either or both of [them]." **Ex. E**, 41:21-25, 42:1-3. As such, he applied an elbow strike to Plaintiff's face. *Id.* at 39:9-10. Force in this case was only used because of Plaintiff's repeated non-compliance, and no more force than necessary to ensure Plaintiff's compliance was used. Moreover, Plaintiff clearly posed an immediate threat to the safety of the officers and was actively resisting arrest. *Graham*, 490 U.S. at 396. The totality of the circumstances indicates the force used was objectively reasonable under the circumstances. *Id.* at 396-97.

III. **Defendants Are Entitled to Qualified Immunity Because Plaintiff Cannot Show the Law was Clearly Established in These Specific Circumstances.**

Government officials engaged in discretionary functions are entitled to qualified immunity from § 1983 suits as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Al-Kidd*, 563 U.S. at 741. To satisfy this prong of the test, the Tenth Circuit requires that there "be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight

of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

Plaintiff cannot show the law was clearly established in these specific circumstances. No Tenth Circuit or Supreme Court case would put a reasonable officer on notice that the Constitution forbids the stop of a vehicle when an officer has determined the registered owner has an outstanding felony warrant; that an officer lacked probable cause to detain the passenger in that same vehicle when he had disobeyed multiple commands and was suspected of potentially having a weapon; that officers lacked probable cause to arrest that same passenger when he disobeyed multiple commands, physically advanced toward an officer, and then put his hands on that same officer; and/or that the force used against that individual was "excessive" in light of these circumstances, which involve an individual kicking and kneeing two officers in the course of his arrest while he continued to resist the same. As a result, Defendants are entitled to qualified immunity.

## IV. Plaintiff Cannot Demonstrate that Sgt. O'Neill Failed to Intervene.

The only claim against Sgt. O'Neill is that he failed to intervene, and this claim is far from well-plead. In his Amended Complaint, Plaintiff passively alleges Sgt. O'Neill "failed to intervene." [Doc. #4, ¶¶ 58, 66, 68.] Failure to intervene claims have two elements: (1) an officer must have "observed or had reason to know of a constitutional violation" and (2) the officer must have had "a realistic opportunity to intervene." *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (quotations omitted). An officer is "not liable merely because he was present at the scene of a constitutional violation," but only "if he had the opportunity to intervene but failed to do so." *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d

1423, 1433 (10th Cir. 1984), *rev'd on other grounds sub nom. City of Lawton, Okla. v. Lusby*, 474 U.S. 805

(1985). More specifically, a plaintiff must show: (i) the subject officer was present at the scene; (ii) the

officer witnessed another officer applying force; (iii) the application of force was such that a reasonable

officer would recognize that the force being used was excessive under the circumstances; and (iv) the

officer had a reasonable opportunity to intercede to prevent the further application of excessive force

but failed to do so. *Erickson v. City of Lakewood, Colo.*, 489 F. Supp. 3d 1192, 1200 (D. Colo. 2020).

It is not sufficient to argue intervention was possible; "[i]n order for liability to attach, there must

have been a *realistic* opportunity to intervene to prevent the harm from occurring." *Vondrak v. City of

Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

1994)) (emphasis added). "In other words, the officer must have witnessed the use of excessive force,

had a realistic opportunity to end it, and failed to do so." *Sexton v. Hickenlooper*, No. 13-cv-01008-MSK-

KMT, 2014 WL 1091936, at *14 (D. Colo. Mar. 19, 2014). "Summary judgment is appropriate where

no reasonable jury could conclude that an officer was forewarned of the violation or had the ability to

stop it once in progress." *Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 872 (D.N.M. 2020).

A.  No Constitutional Violation Existed.

The threshold issue in a claim for failure to intervene is whether there is an underlying

constitutional violation. *Jones*, 809 F.3d at 576. As demonstrated by the above, no constitutional

violation occurred, so any failure to intervene claim must fail as a matter of law.

B.  Sgt. O'Neill Did Not Witness or Have Reason to Know of a Constitutional Violation.

Even if a constitutional violation existed, no officer can be held liable for failing to stop a

constitutional violation they never observed. *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 & n.24

(4th Cir. 2002) (defendant officer must "know[ ] that a fellow officer is violating an individual's

constitutional rights"; if he "lacks such specific knowledge, he cannot be a participant in the unlawful

14

acts"). Plaintiff cannot meet the observation prong because Sgt. O'Neill was not in a position to perceive any constitutional violation. *Diaz v. Sola*, No. CV 10-4123-DDP (JPR), 2015 WL 13918909, at *6 (C.D. Cal. Sept. 10, 2015), *adopted*, 2015 WL 13918989 (C.D. Cal. Oct. 28, 2015) ("If the other Defendants did not beat or kick Plaintiff, or if they did but [an officer] did not know it … there can be no liability on his part.").

Here, Sgt. O'Neill's BWC shows he was stationed several feet away from the vehicle, at its rear, while Plaintiff's arrest was taking place at the passenger side of the vehicle. **Ex. C**, 5:09-5:22. Sgt. O'Neill's view was, at times, obstructed by the intervening vehicle, in addition to the bodies of the officers whose positions often changed during the struggle. *Id.* at 5:20-5:46. Further, Sgt. O'Neill's attention was fully occupied by Hernandez, Jr., who was pulling away in attempt to move closer to Plaintiff. *Id.* at 5:46-6:20. Sgt. O'Neill did not hear any of the commands given by Ofcs. Johnson or Larson, nor did he witness any use of force. **Ex. B**, 89:2-8. The evidence indicates Sgt. O'Neill did not witness or have reason to know of any constitutional violation and, as such, summary judgment is proper. *See Damiani v. Duffy*, 754 F. App'x 142, 146 (3d Cir. 2018); *Smith v. Williams*, No. 06-cv-00436-LTB-GJR, 2007 WL 174378, at *6 (D. Colo. Jan. 19, 2007) ("Since Deputy Williams did not see the takedown, and the takedown lasted only a few seconds, Deputy Williams did not have the opportunity to intervene, and so cannot be liable for failure to do so.").

C.  Sgt. O'Neill Did Not Have a Realistic Opportunity to Intervene.

Even if a constitutional violation occurred *and* Sgt. O'Neill had witnessed the same, he did not have a realistic opportunity to intervene.

As noted in the SUMF, the encounter with Plaintiff was exceedingly short, and only ten seconds of which involved any use of force. **Ex. C**, 5:40-5:50; **Ex. F**, 00:40-1:36. "Officers cannot realistically be expected to stop conduct 'which transpired in a matter of seconds.'" *Tanner v. San Juan Cnty. Sheriff's*

*Off.*, 864 F. Supp. 2d 1090, 1156 (D.N.M. 2012) (quoting *Ting v. U.S.,* 927 F.2d 1504, 1511-12 (9th Cir. 1991)); *see Savannah v. Collins*, 547 F. App'x 874, 875 (10th Cir. 2013).

Moreover, there are "no cases in which an officer was held liable for another officer's use of force where this use of force was sudden, unannounced, and short in duration." *Choate v. Huff*, 773 F. App'x 484, 488 (10th Cir. 2019).[4] Here, Ofcs. Johnson and Larson separately delivered two blows, unannounced, in rapid succession. **Ex. C**, 5:40-5:50; **Ex. D**, 126:14-16; **Ex. E**, 39:9-17. Sgt. O'Neill could not "have done anything to prevent the other officers' short, sudden use of force once it began." *Id.*; *see Slatton v. Hopkins*, No. 18-cv-3112-RBJ, 2020 WL 4539624, at *10 (D. Colo. Aug. 6, 2020) ("Officer Hopkins' baton strike and pepper spraying happened so suddenly and quickly that it appears quite unlikely that Officer Barnes even had time to intervene."). "[G]iven the brevity of the entire restraint incident," the Court cannot conclude Sgt. O'Neill had a realistic opportunity to intervene and, thus, Plaintiff's failure to intervene claim must be dismissed. *Wallin v. Dycus*, 381 F. App'x 819, 823 (10th Cir. 2010).

## V.  **Plaintiff's Malicious Prosecution Claim Cannot Survive Summary Judgment.**

In support of his Third Claim for Relief [Doc. #4, ¶¶ 69-81], Plaintiff alleges Ofcs. Johnson and Larson intentionally made "false statements in their police reports which directly led to the charges against [Plaintiff]"; "laughed loudly about the beating afterward, showing that they enjoyed beating [Plaintiff]"; and that Defendants' statements after Plaintiff's arrest indicated they had not figured out what Plaintiff would be charged with, which he argues is indication of "fabricating charges." [Doc.

---

[4] In *Choate*, the Court noted it had previously "cited approvingly to a Second Circuit case in which the court held that a defendant had no duty to intervene when three blows were struck in such rapid succession that the defendant had no realistic opportunity to attempt to prevent them." *Id.* (citing *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)) (cleaned up).

#4, ¶ 73]. There is no evidence supporting these allegations and summary judgment is proper.

With respect to his § 1983 malicious prosecution claim, Plaintiff must prove (1) Defendants caused him continued confinement or prosecution; (2) the original action terminated in his favor; (3) no probable cause existed to support the original arrest, continued confinement, or prosecution; (4) Defendants acted with malice; and (5) Plaintiff sustained damages. *Moses-El v. City & Cty. of Denver*, No. 20-1102, 2022 WL 1741944, at *8 (10th Cir. May 31, 2022); *see also Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007). Plaintiff's malicious prosecution claim fails because, (1) as discussed at length above, probable cause existed for the arrest and prosecution, and (2) there is no evidence of malice.

"Malice," within the context of malicious prosecution, is any motive other than a desire to bring an offender to justice. *Grobecker v. Grundy,* No. 13–cv–01190–MSK–KLM, 2014 WL 3593513, *8 (D. Colo. July 18, 2014). Although malice may be inferred from a lack of probable cause, in the District of Colorado, the inference is applicable only when an officer supplied false or misleading information that furthered the prosecution. *Id.* at *9. When such false or misleading statements are not present, general allegations of malice are insufficient. *Id.* Malicious prosecution claims require the plaintiff to show those bringing the malicious prosecution did so with "intentional or reckless disregard for the truth." *Fletch v. Burkhalter*, 605 F.3d 1091, 1095 (10th Cir. 2010).

A.  <u>Defendants Did Not Make Any False Statements in Their Reports.</u>

In his Amended Complaint, Plaintiff sets forth the alleged false statements he believes support his malicious prosecution claim. [Doc.#4, ¶ 77]. However, such statements were not false:

    1.  *Alleged False Statement #1: Ofc. Larson Did Not Attempt to De-Escalate the Situation Prior to Grabbing Plaintiff's Wrist [Doc. #4, ¶ 77(a)]*

As Plaintiff begins to exit the vehicle, Ofc. Larson can be seen attempting to de-escalate the

situation by placing her right hand out as she points inside the vehicle and communicating—"eh, eh, eh"—to Plaintiff not to get out. **Ex. F**, 00:38-42. Plaintiff understood this communication. **Ex. G**, 69:21-25, 70:1-6. Had he simply complied, there would have been no reason for Ofc. Larson to grab his wrist. **Ex. D**, 86:12-14. Moreover, Ofc. Larson was simply controlling Plaintiff's hand; she was not using pressure or force. *Id.* at 129:1-8.

2.  *Alleged False Statement #2: Plaintiff Did Not Advance Toward Ofc. Larson [Doc. #4, ¶ 77(b)]*

This allegation is contrary to the BWC. Despite understanding Ofc. Larson's command meant "not to do something" (i.e. remain seated), Plaintiff ignored it. **Ex. G**, 70:1-6. In the process of standing up, he is clearly seen swinging his left leg out of the vehicle (toward Ofc. Larson), followed by his right leg (toward Ofc. Larson), and then standing up and rotating his upper body toward Ofc. Larson. **Ex. F**, 00:40-:43. Ofc. Larson interpreted these movements as an advancement. **Ex. D**, 87:3-4, 16-20.

3.  *Alleged False Statement #3: Plaintiff Never Raised His Arms Prior to Ofc. Larson Grabbing His Wrist [Doc. #4, ¶ 77(c)]*

As Plaintiff lifts himself out of the vehicle, his right wrist raises with his body, and his right hand begins to ball up as if to make a fist. **Ex. F**, 00:41-43. Ofc. Larson then grabs his wrist. *Id.*

4.  *Alleged False Statement #4: Plaintiff is Physically Incapable of Kicking or Swinging His Leg [Doc. #4, ¶¶ 77(d)-(e)]*

Plaintiff is capable of kicking or swinging his leg to gain momentum as is evidenced by these exact actions which he uses to pull himself out of the vehicle. **Ex. F**, 00:38-41. Additionally, his right leg can be seen mid-swing on Sgt. O'Neill's BWC. **Ex. C**, 5:40-5:41. Later, on Ofc. Johnson's BWC, Plaintiff can be seen clearly kicking his leg. **Ex. I**, 1:58-2:00.

5.  *Alleged False Statement #5: Plaintiff Made No Verbal Threats Defendants [Doc. #4, ¶¶ 77(e)]*

Plaintiff is clearly heard exclaiming in a threatening tone to the officers, "You're gonna…. What's

your name boy? What's your name boy? I'm gonna get you. I'm gonna get you." **Ex. F**, 1:45-2:04.

6. *Alleged False Statement #6: Plaintiff Never Kicked Ofc. Johnson in the Groin [Doc. #4, ¶¶ 77(f)]*

When Plaintiff was directed against the vehicle, Plaintiff's right leg is seen raised and pulled back, the first step in gaining momentum. **Ex. F**, 1:37-1:41. While the knee strike itself is blocked on BWC, Ofc. Johnson is heard saying to Plaintiff: "Knee me in the balls, what the fuck is wrong with you?" *Id.* Rather than denying it, Plaintiff responds: "I can't help it." *Id.*

Plaintiff's allegation that Defendants made false statements is patently untrue.

B. Defendants' Laughter Had Nothing to Do with Plaintiff.

There is no dispute that officers laughed on scene at some point after Plaintiff was placed under arrest. However, it is common for officers to use laughing to cope through injury and incidents in which they are involved. **Ex. D**, 126:7-16. Sgt. O'Neill testified the reason for laughter was due to "a comment that the fire department had made at the scene regarding the pants [Sgt. O'Neill] was wearing, and the officers found it amusing that the fire department was pointing out the back of [his] pants were too baggy." **Ex. B**, 108:7-13. Nothing about this situation demonstrates malice as the laughter that occurred had nothing to do with Plaintiff.

C. Defendants Were Aware of Charges Prior to Arrest and There Was No Fabrication.

In support of his malicious prosecution claim, Plaintiff alleges that despite his arrest, it is "clear from the officers' statements . . . they 'hadn't figured out' what they would charge him with." [Doc. #4, ¶ 73.] This is based on Plaintiff's misinterpretation[5] of an answer given by Sgt. O'Neill, which is heard on the BWC. **Ex. C**, 8:42-8:53. During this moment, Ofc. Johnson is holding Plaintiff's arm, and Plaintiff asks Sgt. O'Neill to "tell him to get off me." *Id.* at 8:40-8:42. Sgt. O'Neill responds by

---

[5] Defendants originally misheard also. However, through discovery, Defendants recognized the mistake. Defendants will seek leave to amend their Answer to "deny" Plaintiff's misinterpretation.

explaining that Ofc. Johnson was checking to be sure he did not have anything illegal on him because he was under arrest, "if he hadn't figured that out yet." *Id.* Ofc. Johnson confirmed this misinterpretation in his deposition. **Ex. E**, 69:10-15.This statement is not evidence of fabricated charges.

D. There is No Evidence Defendants Acted With "Intentional or Reckless Disregard for the Truth."

The evidence establishes that the charges brought against Plaintiff were reasonable and supported. *See* **Ex. H**. Not only is there no evidence the charges were brought on the bases of alleged "false statements," there is no evidence Defendants acted with "intentional or reckless disregard for the truth." *Fletch*, 605 F.3d at 1095. Conclusory, unsupported allegations are not enough. *Rolland v. Primesource Staffing, LLC*, 457 Supp. 2d 1221, 1224 (D. Colo. 2006). As such, Plaintiff cannot meet his burden and summary judgment is proper. *Fletch*, 605 F.3d at 1095.

## CONCLUSION

WHEREFORE, Defendants respectfully request the Court grant this Motion and dismiss Plaintiff's Amended Complaint in its entirety with prejudice.

Dated this 23rd day of January, 2023.

Respectfully submitted,

*s/ Jodanna Haskins*
Jodanna L. Haskins, Assistant City Attorney
Denver City Attorney's Office, Civil Litigation
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January 2023, the foregoing **DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court via the CM/ECF
system, which will send notification of such filing to the following:

S. Birk Baumgartner, Esq.
Adam Yoast, Esq.
Sean M. Simeson, Esq.
Baumgartner Law, LLC
birk@baumgartnerlaw.com
adam@baumgartnerlaw.com
sean@baumgartnerlaw.com
*Attorneys for Plaintiffs*

                                        *s/ Camelia Close*
                                        Denver City Attorney's Office